# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| | : | |
| JOSEPH BREITFELDER | : | CASE NO. C-1-01-617 |
| | : | |
| | : | JUDGE BECKWITH |
| | : | |
| v. | : | |
| | : | |
| SIMON LEIS, ET AL | : | |
| | : | |
| | : | |

---

**PLAINTIFF RESPONSE TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

I.      INTRODUCTION.……………………………………...…4

II.     JURISDICTION AND VENUE……………………….............…4

III.    FACTUAL BACKGROUND…………………………...………4

IV.     APPLICABLE LAW……………………………………....……13

        A.      Summary Judgment/Standard of Review………..…….14

        B.      American with Disabilities Act………………...………15

V.      **GENUINE ISSUE OF MATERIAL FACT EXIST ON
        THE ADA AND REHABILIATION ACT CLAIMS
        WARRANTING TRAIL**………………………….………........…18

        A.      Detective Breitfelder was an Otherwise
                Qualified Employee with Disability…………………...18

                1.  Detective Breitfelder was Disabled
                    Contrary to the Sheriff's Belief he was
                    Faking Injuries…………………….…………….20

                2.   Plaintiff was Qualified to Perform Essential
                     Functions of at Least with Non-Arrestee
                     positions……………………………………...…..22

        B.      Sheriff Leis Refused Plaintiff's Request for Reasonable
                Accommodations………………………………...24

        C.      Plaintiff's Receipt of PERS Benefits Does Not
                Foreclose a Finding That Detective Breitfelder is
                Otherwise Qualified or Cannot Claim Disability
                Discrimination……………………………………...……26

IV.     GENUINE ISSUES OF MATERIAL FACT EXIST AS

AMOUNT OF OVERPAYMENT DUE THE COUNTY FOR RECEIPT OF OIL AND WORKERS COMPENSATION BENEFITS……………………………………..29

V.    CONCLUSION…………………………………………………..30

Now comes Plaintiff Joseph Breitfelder, by and through counsel and who presents the following argument in response to Defendants' motion for summary judgment:

I. **INTRODUCTION**

Plaintiff herein opposes Defendant's motion for summary judgment on his claim that Defendant discriminated against Plaintiff in violation of the American's Disability Act (ADA), by not providing Plaintiff reasonable accommodations for Plaintiff's disability. Plaintiff raises his claim pursuant to 29 U.S.C. 1630.4 of the ADA which includes a right to compensatory, punitive damage, and attorney fees.

II. **JURISDICTION AND VENUE**

Jurisdiction is proper inasmuch as this action arises under federal law, specifically, the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101-12213 and the Rehabilitation Act.of 1973, 29 U.S.C. §794 et seq. Venue is proper inasmuch as the incidents which gave rise to this action occurred in the Southern District of Ohio.

III. **FACTUAL BACKGROUND**

Plaintiff, Detective Joseph Brietfelder, worked at the Hamilton County Sheriff's department from 1984 until the time of his last on-the-job injury in September 1999. Detective Brietfelder (hereinafter "Brietfelder" or "Plaintiff") worked his way from a non-law enforcement position of Patrol Clerk to a full Corporal and Detective Status within a specialized division called the Regional Enforcement Narcotics Unit ("RENU"). RENU is a joint operation between the Sheriff's Office and the Cincinnati Police to investigate narcotic and vice activity. Ex. 1, Breitfelder Affidavit at ¶5; Ex. 2, Depo p17-20) Brietfelder was assigned to the RENU intelligence unit in 1995 performing highway interdiction. Ex. 3. Brietfelder remained with the RENU unit until his last day of work

on September 24, 1999.  Ex. 1.

Initially, Brietfelder was under the supervision of Lieutenant Michael Bogenschutz during his term in highway interdiction.  In 1998, Plaintiff transferred into the intelligence branch of RENU under the supervision of Sergeant Glenn Cox.  Cox came to RENU from the Cincinnati Police Department.  The intelligence unit performed covert investigations related to illegal drug activities.  Shortly after transferring into the intelligence unit, Plaintiff requested a transfer out in part due to the excessive overtime required by Sergeant Cox and in part due to abusive conduct by Sergeant Cox.  Ex. 2 p. 50-61, 96-100; Ex. 4.

The transfer was placed on hold and never implemented.  In the meantime, in early summer of 1999, Plaintiff incurred the first of three (3) on-the-job injuries when a door fell on his back during an investigation.  The accident caused a soft tissue injury to Brietfelder's back which was treated primarily with rest and prescription pain killers, including Vicodin. Ex. 1 ¶8, Ex. 2 at 65.   He was placed on light duty for the back injury, but missed very little work during recovery.  Then, in July 1999, while driving the RENU van, he was rear-ended and incurred a rotator cuff injury. Ex. 1 ¶9.  Again, Plaintiff was placed on light duty by orders of his physician Dr. Roberts and treated with Vicodin, with an initial recommendation for surgery.  Plaintiff was later ruled out as a surgical candidate.  Following this injury, Plaintiff still only missed just a few days of work, and continued thereon in light duty and treatment with Vicodin.  Ex.2 at 72-87.  Brietfelder informed both Sergeant Cox and Cox's superior Lieutenant Winall.  Id.

The RENU unit, similar to other divisions of the Sheriff's department, requires all officers to meet specific minimum physical skill and ability requirements for continued

employment. Ex. 2, p 37-38.   However, the terms of the collective bargaining agreement governing the employment of Plaintiff and other Sheriff Department employees states that the department will accommodate disabled employees through reasonable accommodation, including job reassignment.  Ex. 5.   Despite the specific language of the collective bargaining unit, the department did not establish an express light duty policy.  Instead, all requests for accommodation including reassignment were reviewed and awarded at the discretion of the Sheriff, Simon Leis.  Ex.6 p. 9-10.

For example, Sergeant Cox, Breitfelder's supervisor, was injured in 1997 and suffered an ongoing disability to his neck, a remarkably similar injury to Plaintiff's. Sergeant Cox was accommodated in his job with assistance from his co-workers for lifting heavy objects, assumption of his duties that he could not perform, and release from his combative duties such as arrests or dealing with combative prisoners.  Sergeant Cox was unable for the last 2 years of his employment with RENU to perform the tasks required for the Sheriff department's agility test without consequence to his standing with the department. This accommodation was maintained for over three (3) years, until his resignation in January 2000. Ex. 7 ¶4, 5.  In addition, to meet his need for additional accommodation, Sergeant Cox was transferred to a sedentary computer job with the Y2K division in the Fall of 1999.  Ex. 8.

In addition to Sergeant Cox, the Sheriff Department has reasonably accommodated two (2) other officers by reassigning them to data inquiry positions within the department.  The Sheriff has also reassigned a third officer to the position of Patrol Clerk, but instead of accepting this position, the Officer chose to resign.  Exhibit 9, EEOC Response.  Therefore, there appears to be a pattern of accommodation through the

use of desk-type, non-physically tasking computer assignments.  See also, Ex. 14, Req. for Admission.

In contrast, following the June and July 1999 duties, Plaintiff was not specifically accommodated in his job duties. If he needed any help with lifting or other physical task, he would be forced to ask someone for help.  Ex. 1, ¶15; Ex 2 p.76-80.  Then, in September 1999, Plaintiff was again injured in an on-the job accident in which Sergeant Cox himself ordered Detective Brietfelder to install a monitoring device under a car, over Brietfelder's objections and request for accommodation, and then pushed the car on Breitfelder while he lying was under the car.  Plaintiff still suffers from this on-the-job injury to this day.  Ex. 10 p 23-24

The September 24th incident occurred when the RENU unit acquired new covert monitoring devices for use in its operations.  Brietfelder was specially trained in the use of covert devices, had some car mechanic experience, and was known within the department for his computer expertise.  Ex. 2, p.21;  Ex.7 ¶3.  Cox notified Plaintiff that he should oversee a trial installation and Detective Brietfelder made arrangements to unpack the equipment and prepare it for installation by a co-worker Brian Williams, due to his own light duty status.  Ex. 1, ¶16-18.  Sergeant Cox at the time of the installation refused Brietfelder's request to allow Matthews to install the device, and ordered him to crawl under the car.  Detective Brietfelder had also suggested that the installation be moved to the District One garage, in lieu of the SRT unit, because it had a car lift.  This request was also refused even though Plaintiff explained to Sergeant Cox that the FBI suggested using a lift for installation because they deemed crawling under the car unsafe. Ex. 2 p.114-124.

At the time of this incident, Detective Breitfelder understood that he was still on work restrictions. Ex. 11, p.275, 288-291. Nevertheless, Detective Brietfelder did as he was ordered, crawled underneath the car and performed the installation. Just as he was completing the job, he looked to see Cox's feet near the fender of the car and remarked that there was very little room to move underneath the car. Then he heard Cox state, "here you go" and the car was forced down on his head. Ex. 2, p. 127-139. Plaintiff yelled, felt his neck snap, saw a flash of light, then felt a rush of pain shortly thereafter.

Detective Breitfelder came out from under the car while still in considerable pain, and ultimately drove himself to the office. He spoke to several other officers there and then decided he needed to leave. Ex. 2 p. 147-48. Lt. Bogenschutz drove him home and then later contacted him to gather information for an incident report. Plaintiff took some Vicodin for the pain then and for the next few days hoping like his previous incidents the pain would subside sufficiently to return to work. By the end of the weekend, the pain was severe and his father took Brietfelder to the hospital. Ex. 2, p.151-4. Lt. Bogenschutz came to Plaintiff's home following his release from the hospital to obtain a signature on the incident report, which Brietfelder refused to sign, as it contained false statements. A second report was prepared which was corrected. Brietfelder was in an arm sling and had a neck brace for what was diagnosed as a cervical injury. Ex. 2, p.162-168.

Breitfelder was instructed to continue his analgesic medication and was given anti-inflammatory medicine. He consulted Dr. Roberts who referred him to Dr. Shapiro at the Mayfield Clinic for neurological evaluation and treatment. Ex. 2, p.174-177. Following several months of treatment, Dr. Shapiro referred Plaintiff to Dr. Jobalia for

pain treatment, because with his pre-existing problems he was not a good surgical candidate. Dr. Jobalia attempted several drug regimens, including for a period of time oxycotin. Ex. 2, p.179-180. Mr. Breitfelder took himself off the oxycotin and another regimen was started which included MS Contin and continuation of Vicodin that he had used for his previous injuries. Id.

During this period of treatment regimens, Mr. Breitfelder was unable to work. He applied for workers compensation and the Sheriff's Occupational Injury Leave ("OIL") within a month of the accident. Ex. 10, p.31-32  Under the OIL program, the leave with pay must be approved by the supervisors of the employee and then ultimately by the Sheriff. Ex. 12.

Detective Breitfelder received a telephone message mid November directing him to report to work in the Road Patrol Division as a Patrol Clerk. Breitfelder, for fear of aggravating his injuries, refused the assignment and immediately contacted the Sheriff's office to request a meeting. Ex. 1 ¶27, Ex. 10 p. 37  Detective Breitfelder had previously worked the patrol clerk position during a light duty assignment in 1992, and knew the requirements of the job, which include the ability to escort prisoners who could be combative. Ex. 2 p.186.  He knew he could not perform those duties. Ex. 1 ¶27, Ex. 6 p. 27.

The meeting with the Sheriff occurred the same day.  Due to his problems with his medications and ongoing pain, Breitfelder was driven to the meeting by his father, William Breitfelder, who is a former Chief U.S. Marshall and who personally knew Sheriff Leis.  The elder Mr. Brietfelder was excluded from the meeting initially but did have the opportunity to speak with Sheriff Leis following the meeting. Ex. 6, p.27.  In

the actual meeting, attended by the Sheriff, Detective Breitfelder, Gail Wright, and Chief Deputy Sean Donovan , the Sheriff proposed to Detective Breitfelder that he take the patrol clerk job.  The parties discussed the OIL application and Plaintiff requested approval of the application as well as a reassignment to a sedentary position, possibly working with computers that did not require physical demands of the patrol clerk job. Ex. 11, p. 222-223; Ex. 13; Ex. 14.

The Sheriff refused the requested accommodation for reassignment without explanation. Ex. 11, p.222.  The Sheriff believed that Plaintiff was putting on an act during the November 19th meeting and the request for an alternative computer was unwarranted.  The Sheriff during his deposition in this case stated in relation to the November 19th meeting:  "I know he was putting on an act.  I mean it was very obvious, he—when we sat there and talked to him, he'd hold his head like this.  Then when we got into the discussion and he forgot that he should be holding his head like that, he'd be up like this talk in a normal fashion." Ex. 6, p.16-17.

At the conclusion of the meeting, the elder Mr. Breitfelder talked with the Sheriff and discussed the need for his son's reassignment.  The Sheriff stated that "Joe should just tough it out."   Ex. 15 p.14.  The Sheriff insisted that he could not simply reassign Detective Breitfelder. Ex. 11, p. 223.  Moreover, the Sheriff believed that Detective Breitfelder could perform the physical requirements of the patrol clerk job.  Ex. 6, p.11. In the end, the Sheriff admitted believing that Detective Breitfelder was faking his injury and that his claim is a fraud because of the lack of objective evidence of an injury.  Id. p. 23, Ex. 14.

Despite the Sheriff's belief, a series of medical examinations were ordered

primarily for the decision on the OIL benefits.  Ex. 16.  Detective Breitfelder had

submitted a report from Dr. Roberts, and the Sheriff's office ordered further examinations

by Dr Koppenhoefer and Dr. Bacevich.  Ex. 6, p.13, 19.  The Roberts report determined

that Detective Breitfelder could not perform the patrol clerk duties.  Ex. 16.  Dr.

Koppenhoefer reported that he could find no objective evidence of injury but

recommended reassignment based on the apparent physical limitations.  Dr. Bacevich, in

his initial review, concurred about the lack of objective evidence following his brief

exam, but reported that he would need additional testing as well as recommending a

psychological evaluation.  Ex. 16.   Subsequent reports from Dr. Shapiro and Dr. Jobalia,

Detective Breitfelder's attending physicians, reported ongoing disabling pain.  Ex. 17

Sheriff Leis did not order a psychological examination or further inquire of Dr.

Bacevich or Koppenhoefer until April of 2000.  He denied the OIL request on March 17,

2000.  Ex.12.   At the time of the OIL denial, Sheriff Leis had the following medical

reports:

(1)    Dr. Koppenhoefer's finding that Brietfelder could NOT perform the

regular duties of a patrol clerk, but could possibly perform the reassignment ("light

duty") duties with the question of whether he could break up fights.  Ex. 16

(2)    Dr. Robert's finding that Breitfelder could NOT perform either the regular

job or the reassigned job.  Ex. 16

(3)    Dr. Bacevich's finding that light duty was not possible due to the amount

of pain and his restriction of motion in the neck and arms.  Ex. 16

(4)    Dr. Shapiro's report with full examination stating the Breitfelder needed to

remain off of work. Ex. 16

Detective Breitfelder filed a grievance on the denial of the OIL.   The ongoing physical problems, along with the exhaustion of his paid leave, left Plaintiff with serious financial problems as well as problems with depression. Ex. 1, ¶31.  Breitfelder intended to devote his life to law enforcement from the time he was in kindergarten.  Ex. 10, p.108.

A meeting was held April 7, 2000 to complete the OIL grievance process. Detective Breitfelder attended with Guy Kaufman, a FOP representative and Chief Deputy and Sheriff Leis were present.  Breitfelder told the Sheriff that he was willing to return to work with appropriate accommodations and offered to be reevaluated by a physician of the Sheriff's choice and would accept anything the new evaluation determined.  Ex.1 ¶30.; Ex. 9

The Sheriff refused the offer and maintained his denial of the OIL benefits.  Ex. 6, 10, 12.  Instead, the Sheriff contacted Dr. Bacevich, whose examination of Mr. Brietfelder consumed only about ten (10) minutes for a follow up report based on Dr. Shapiro's findings.  Ex. 19;  20.   During the OIL meeting in April, it was clear that the Sheriff was committed to the idea that, regardless of the medical evidence, Breitfelder was faking his injuries and his claim for OIL was a fraud.  Ex. 6, p.16-17.  Not surprisingly, the subsequent  Bacevich report concurred with the Sheriff's belief.  Ex. 21.

During the almost six (6) month period awaiting approval of the OIL, in which Breitfelder was in desperate financial condition, Breitfelder learned of the PERS disability benefit which acts as a long term disability plan. Ex. 1, ¶31, 32; Ex.10, p.108. Detective Breitfelder submitted an application for the PERS benefit.  The Sheriff's assistant also discussed the PERS program with Breitfelder and explained to him that the

benefit was for a five (5) year term in which if there was improvement, he could be re-installed in his job. Ex. 10, p.108. The PERS benefit provides a monthly income and also allows Detective Breitfelder to continue health insurance for himself and his children. Id.p.139-40. The PERS benefit was approved in November of 2000. The Sheriff submitted an employer report as required by statute, but failed to denote whether Detective Breitfelder had an injury. Instead, the Sheriff noted information pertaining to a "factitious injury." Ex. 22. In the meantime, Detective Breitfelder submitted his OIL grievance to arbitration as required by the collective bargaining agreement and was awarded full benefits. Ex. 23.

To date, Detective Breitfelder has had no communication from the Sheriff's department concerning his ongoing disability and the status of his condition as required by the PERS statute. Breitfelder has applied for his deferred compensation benefits and in this context the Sheriff has reported that he was officially terminated in May 2000. Ex.1, ¶35.

## IV.    APPLICABLE LAW

Plaintiff herein argues that he is a disabled person who is otherwise qualified to perform the duties of a Detective in the RENU unit of the Sheriff's department with reasonable accommodations. AS a result of Sheriff Leis' outright refusal to provide reasonable accommodations, Plaintiff was discriminated against in violation of the American Disabilities Act. Defendants argue that Detective Breitfelder is (1) not disabled, (2) not otherwise qualified, (3) they did not fail to accommodate the Plaintiff, and (4) that Plaintiff is precluded from arguing his disability because he is currently

receiving disability benefits under the state OPERS program.[1]

Plaintiff argues here that genuine issues of material fact exist as to (1) whether Plaintiff is indeed disabled as the term is defined under the Americans with Disabilities Act, (2) whether he is otherwise qualified to perform the duties of detective in an accommodating "job reassignment," and (3) whether by Defendant failing to provide reasonable accommodations to Plaintiff, and as such (4) whether he suffered an adverse employment action in violation of the American Disabilities Act.  Further, the receipt of long term disability benefits from the Ohio Public Employee Retirement System (OPERS) does not preclude a finding of violation of the ADA as this benefit is designed to cover temporary as well as permanent total disabilities.

A.    SUMMARY JUDGEMENT/STANDARD OF REVIEW

On summary judgment, a movant bears the initial responsibility of informing the court of the basis of its motion. Celotex Corp. v. Catrett, 47 U.S. 317 (1986).   Summary judgment is proper only if, on the basis of the record at hand, there exists no genuine issue of material fact, and if the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).  If the moving party meets its burden, the "burden of going forward, the burden then shifts to the nonmoving party" to present some evidence that creates an issue of material fact.  Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 150 (6th Cir. 1995).

A genuine issue of material fact precluding summary judgment must be one for which a reasonable jury could return a verdict for the non-moving party.  Anderson v.

_____

[1] Plaintiff also raises his claims under the Rehabilitation Act of 1973 which provides the same protection to disabled persons as the ADA applicable to entities which receive federal funds.   As the arguments and issues are identical, and Defendants have acknowledged the receipt of federal funds, Plaintiff will combine his arguments for both claims.  See, Answer

Liberty Lobby, Inc. 477 U.S. 242, 248 (1986).  In reviewing a claim for summary

judgment, the Court here must view all evidence in the light most favorable to the non-

moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.  475 U.S. 574 (1986).

"Judgment as a matter of law is appropriate only when there is a complete absence of

fact...so that no reasonable juror could have found for the non-moving party."  Kiphart v.

Saturn Corp., 251 F.3d 573,581 (6th Cir 2001)(citing, Moore v. KUKA Welding Sys. &

Robot Corp., 171 F.3d 1073, 1078 (6th Cir 1999).

>    B.    AMERICANS WITH DISABILITIES ACT

The purpose of both the Americans With Disabilities Act of 1990 and the

Rehabilitation Act of 1973  is to prohibit discrimination of an otherwise qualified persons

in the workplace by employers. 29 C.F.R 1630 appendix; 29 U.S.C. §790; Toyota Motor

Mfg., Ky, Inc v. Williams, 534 U.S. 184 (2001).   Both Acts prohibit using an

individual's disability as a rationale in making employment decisions including

determining an employee's compensation and benefits, hiring, terminating, and

promoting employees, privileges of employment, and other terms of employment.   42

U.S.C. 2112(a), 29 U.S.C. 701.

"When an individual's disability creates a barrier to employment opportunities,

the ADA requires employers to consider whether reasonable accommodation could

remove the barrier.... an employer must take steps to reasonably accommodate, and thus

help overcome the particular impediment." 29 C.F.R 1630 appendix.  Under both Acts,

an employer is bound to provide reasonable accommodations for known disabilities to

otherwise qualified persons.  42 U.S.C. 2112(a), 29 U.S.C. 701.  Not providing

reasonable accommodations is a form of discrimination under the ADA and the

Rehabilitation Act. Kiphart v. Saturn Corp. 251 F.3d 573, 581 (6th Cir. 2001). Where an employer acknowledges a failure to accommodate an employee's injury, there exists direct evidence of discrimination. Black v. Roadway Express, Inc. 297 F.3d 445 (6th Cir 2002) Where such direct evidence of discrimination exists, the employee must show that:

"(1) he or she is disabled, and

  (2) that he or she is otherwise qualified for the position despite his or her disability:

(a) without accommodation from the employer;

(b) with an alleged essential job requirement eliminated;

(c) with a proposed reasonable accommodation." Black, at 450 (*quoting*, Monette v. Elec. Data Sys. Corp, 90 F.3d 1173, 1186 (6th Cir 1996)).

As a threshold issue then, there must exist evidence of a disability, as defined and construed under the ADA. The statute itself defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual." 42 U.S.C. §12102(2)(A). Regulations further define a physical impairment to be "any physiological disorder, or condition, cosmetic disfigurement or anatomical loss affecting body systems." 29 CFR §1630.2(h). Under the law, the impairment must "substantially limit" a major life activity which includes under regulation "functions such as walking seeing, hearing" and others including "working." 29 C.F.. §1630.2(i). A "substantial limitation" for working is defined as a "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and ability. 29 C.F.R.

§1630.2(j)(3)(i).  Proof of the impact on a single particular job does not meet the necessary "substantial Limitation" for working.  Id.

A otherwise qualified person is one who meets the requisite skills, experience, education and other job related requirements and who can perform the essential function of the position  with or without reasonable accommodations.  29 C.F.R. 1630.2(m), 42 U.S.C. 2112(b)(5)(A).  The essential functions of a position are the duties that the employee actually performs which if not performed would substantially alter the job position.29 C.F.R. 1630.2(n).  Whether a function is essential to a position is a question of fact typically not resolved in a motion for summary judgment.  Kiphart v. Saturn Corp. 251 F.3d 573, 581 (6th Cir. 2001).

An accommodation is any change in the work environment or changes in the way things are done enabling the person with a disability to perform the job functions. 29 C.F.R. 1630.2(o).  Reasonable  accommodations include job restructuring, use of paid and unpaid time off, and re-assignment to a vacant position.  42 U.S.C. 12111(9)(B), 29 C.F.R. 1630.2(o)(2).   Upon the request by a qualified person, an employer must determine the essential functions of an employment position, consult with the qualified individual seeking the accommodation to ascertain the individual's limitation and what accommodations are required, consider of the qualified individual's preference of accommodations, and select an accommodation to effectively meet the qualified person's limitations.  29 C.F.R. 1630.2(o)(3).

Finally, it is well-settled that receipt of a disability benefit from a state or federal program cannot in and of itself estop a Plaintiff from raising a claim under the ADA or Rehabilitation Act.  Cleveland v. Policy Mgt Sys. Corp, 526 U.S. 795 (1999); Griffin v.

<u>Wal-Mart Stores, Inc.</u>, 135 F.3d 376 (6th Cir 1998); <u>See also</u>, <u>Justice v. Pike Co. Bd.of</u>

<u>Educ.</u>, Case No 01-6156 (11/4/03 6th Cir 2003). Ex. 24.  In these circumstances, the

Plaintiff must simply "provide an explanation sufficient to warrant a reasonable juror

finding that, despite (the) statement that (he) is unable to work, that (he) could

nonetheless perform the essential functions of (his) job, with or without reasonable

accommodation."  <u>Justice</u>.

<u>**V.**</u>     <u>**GENUINE ISSUE OF MATERIAL FACT EXIST ON THE ADA AND REHABILTIATION ACT CLAIMS WARRANTING TRIAL.**</u>

It is clear from the facts of this case that the Sheriff Simon Leis specifically

refused to acquiesce in any way to Detective Breitfelder's requests for accommodation of

his injuries.  Indeed, the Sheriff repeatedly insists that Plaintiff's claim here is a fraud, a

statement which implicitly denotes a refusal to accommodate.  Ex. 6  Moreover, there is

additional evidence of the Sheriff's position stated in his denial of Occupational Injury

benefits with the submission of documentation of the "factitious disorder," and his

ongoing appeals of the workers compensation claims, even to the extent of the counter

claim in this case.  Ex. 12, 22.  This insistence is made despite overwhelming evidence of

a diagnosed disability from both Detective Breitfelder's attending physicians, physicians

hired by the Sheriff, and those utilized by the OPERS in evaluating the Plaintiff for

qualification for the OPERS benefit.  Ex. 16, 17, 18.  Accordingly, under the existing

standard, Plaintiff will herein show that he did in fact suffer a disability, and was

otherwise qualified for a position with the Sheriff's department with the use of

reassignment as a reasonable accommodation regularly provided other employees.

<u>A.</u>     <u>DETECTIVE BREITFELDER WAS AN OTHERWISE QUALIFIED EMPLOYEE WITH A DISABILITY.</u>

The Sheriff has not disputed that Plaintiff has the experience, training, and other prerequisite skills to be a detective with the Sheriff's Department.  Plaintiff has been employed in law enforcement with the Sheriff's Department since 1984. Ex. 1, ¶2. Plaintiff has held the position of Detective with the RENU section since 1995 with special skills in armament, covert investigations, and computer technology.  Detective Breitfelder was known for his skills in working with computers which enhanced his work with the investigative units and the technology used in covert operations.  Ex. 8

It is also clear that in 1999 Plaintiff suffered a series of three (3) on the job injuries to his back and shoulder.  After the initial injury, Detective Breitfelder was diagnosed with soft tissue damage and placed on light duty with prescriptive pain medication, in particular, vicodin.  Ex. 2, p. 65.  Shortly thereafter he was involved in a car accident and suffered a rotator cuff injury which also placed him on light duty and was also treated with vicodin. Ex. 11.  Despite his light duty status, Detective Breitfelder was simply sent back to his former job, without any specific accommodation for his injuries, forced to continue performing the same duties often in contradiction to his Doctor's orders. Ex.1 ¶14.

The Sheriff insists that his office has no specific light duty policy.  Instead, to comply with his collective bargaining agreement, there are two (2) classifications for officers – arrestee and non-arrestee assignments. Ex. 15, Req 3  An arrestee assignment requires meeting very broadly stated job duties including the ability to control, restrain, even drag prisoners, the ability to break up fights, the ability to complete the Sheriff's physical agility course and the ability to complete a 1.5 mile run.  The non-arrestee assignment requires the same functions of the arrestee EXCEPT meeting the agility test

and the 1.5 mile run.  Ex.13, 16.   Despite his light duty status, Detective Breitfelder was

not places in a non-arrestee job, and was essentially required to perform all his former

duties without specific accommodation.  Ex.1, ¶14.

A genuine issue of material fact exists as to whether Detective Breitfelder

remained on light duty restrictions at the time of his third injury, September 24, 1999.

Ex.1 ¶17, Ex. 11, p.275, 288-91.  Detective Breitfelder was not informed of any change

to his light duty status prior to the September 24 incident.  Id.   In addition, Defendant in

his motion for summary judgment raises the argument that Plaintiff is not otherwise

qualified, because Plaintiff was taking the prescription drug Vicodin, Plaintiff informed

the Sheriff that he could not do the job, and Plaintiff represented himself as being

permanently disabled in application for PERS.  None of these arguments lead to the

conclusion that Plaintiff is not otherwise qualified.

1.    **Detective Breitfelder Was Disabled Contrary to The Sheriff's Belief He Was
      Faking His Injury.**

A threshold genuine issue of material fact exists as to the legitimacy of Detective

Breitfelder's disability.  The Sheriff clearly determined, more or less on his own

subjective opinion, that Plaintiff was faking his injuries. Ex. 6.  The medical opinions are

unable to isolate the source of his injury, but without equivocation state that a level of

disability exists. Ex. 16, 17.   Even the Sheriff's second medical opinion from Dr.

Bacevich, requested after the denial of the OIL benefits and when the Sheriff obviously

established his opinion, provides evidence of an ongoing impairment, despite the

assertion that it was a factitious injury. Ex. 21   Although Plaintiff has established

evidence of soft tissue and cervical injuries to his back, the ADA standard does not

preclude an assumed injury as a disability if it provides the impairment that substantially affects major life activities such as working. 29 C.F.R. §1630.2.

Moreover, the impairment did not simply impact Detective Breitfelder's ability to perform a single job, but was for sometime completely debilitating, qualifying him for the occupational injury leave, which was a short-term disability plan, and then for the long term disability plan OPERS.  Ex. 18, 23.   Detective Breitfelder had "very limited range of motion" and pain through parts of his spine which Dr. Jobalia opined that the source of the pain could not be apparent on diagnostic testing. Ex. 17.  Dr. Shapiro noted the weakness and significantly reduced range of motion that Detective Breitfelder suffered in his arms and shoulder and opined that the symptoms were "classic for what would be a root injury or brachial plexus injury."   As a result he suffered severe "myofascial pain syndrome" and a frozen shoulder possibly a result of his prior rotator cuff injury.  Id..

Even Dr. Bacevich, the Sheriff's diagnosing physician, initially stated that Plaintiff had not been sufficiently evaluated for a diagnosis and recommended further testing including a psychological exam.  Ex. 16.  Dr. Bacevich examined the Plaintiff for no more than 10 minutes, and only thereon reviewed medical records.  His last report, provided on the heals of Sheriff's refusal to approve OIL benefits and his determination that Breitfelder's injury was a fraud, only then raised the possibility that the injury was factitious. Ex. 21.

At the time of the OIL denial and Dr. Bacevich's last report, Detective Breitfelder still struggled with driving and continued with significant pain for some time thereafter. Ex. 10.  Ultimately, the physicians determined that surgery was not an option, and went

into pain therapy treatment for function improvement. Ex. 25, p.11. Detective

Breitfelder also struggled with the pain medications and their side effects until

stabilization was obtained Ex. 2 p.132 . Breitfelder continues to see Dr. Jobalia four to

five times a year. Id. 133. Plaintiff was informed he could perform some sedentary jobs

by Dr. Shapiro in 2000 and he continues in the belief that with appropriate

accommodation, he could return to work. Id . 73-75, 122-125.

The Sheriff's subjective assertion that Detective Breitfelder's injury and claim is a

fraud, in and of itself, creates a genuine issue of material fact on the legitimacy of the

Plaintiff's disability precluding summary judgment. In contrast to this subjective

analysis, Plaintiff has presented significant evidence of his ongoing impairments that

clearly affect major life activities to support his claim which creates a clear factual

dispute.

### 2.    Plaintiff Was Qualified to Perform Essential Functions of At Least  the Non-Arrestee Position.

The Sheriff has not disputed that Detective Breitfelder has the requisite training

and background to perform the essential function of the non-arrestee or even the arrestee

position. Instead, Defendant now argues that Plaintiff could not perform any of the duties

because of his medication regimen, particularly the pain medication Vicodin. This

argument is groundless and contradictory and only again creates a genuine issue of fact

warranting trial.

Significantly, prior to the injuries sustained in September of 1999, Plaintiff had

been performing the duties of detective while taking Vicodin for three months. Plaintiff

was prescribed Vicodin by Dr. Roberts following a vehicle accident in July of 1999. Ex.

1¶10. Following this accident and while being prescribed Vicodin, Plaintiff continued to

perform the essential duties of detective in the RENU Section until his accident in September of 1999.

In addition, medical expert and Plaintiff's treating physician, Dr. Jobalia, found Plaintiff's medication regime inconclusive in determining whether Plaintiff is qualified to perform the duties of patrol clerk and/or detective. Dr. Jobalia recommended functional capacity evaluation to evaluate Plaintiff ability to type and input data into a computer terminal prior to assessing Plaintiff ability to perform the duties within the Sheriff's Department. Ex. 25. Plaintiff had been taking Vicodin while doing these duties prior his injuries in September of 1999. Ex. p.29. It is remarkable that only NOW the Sheriff raises the use of Vicodin as a disqualifying factor to continued employment even in the reassigned non-arrestee position when he allowed Detective Breitfelder to continue in his RENU investigative duties, without any accommodation, while taking Vicodin. Thus, this argument is less than credible.

Moreover, the fact that Plaintiff worked while taking a pain medication is not unique. Officers in the law enforcement field enforcement field do work and take prescription medication for pain. Evidence of this is Plaintiff's father, William Breitfelder. Mr. Breitfelder is currently being treated with Oxycontin for a back injury that he received while on active service in the military in 1958. Ex. 15 p. 6,7. Prior to his retirement Mr. Breitfelder was employed by the Sheriff's department in the position of detective for over six (6) years and worked for the U.S. Marshall for twenty-five (25) years. Ex. 15 p. 9.

The Sheriff attempts, here, without any legitimacy, to argue that taking pain medication per se precludes an officer from duty. Plaintiff previously performed the

duties of detective while taking Vicodin.  The Sheriff's light duty requirements make no mention of pain medications or other disqualifying medicine regimens.  Similarly, other employees, including Sergeant Cox were placed in non-arrestee positions and otherwise accommodated during periods of injury regardless of their medical regimes.  Ex. 8, p.21-26.  To declare Plaintiff not qualified to perform the duties of detective and/or clerk prior to a proper functional capacity evaluation after Plaintiff had been effectively performing such duties is remiss at best, likely incredible.  Again, this argument creates issues of material fact warranting trial and precluding summary judgment.

Although the Sheriff simply argues the pain killer and medicine regimen as the sole basis for disqualification, Plaintiff submits that the Sheriff's office had a policy of allowing officers considerable leniency and accommodation regardless of debilitating injuries.  Sergeant Cox was permitted to remain in his job supervising the RENU officers for an extended period of time even though he could not perform many of the essential functions of his position due to his ongoing neck injury.  Ex. 14, Req 1; Ex. 6, p. 42-51; 63; 91-92.  Moreover, Cox was not even required to submit a physician's order for fitness for duty or for light duty.  Ex. 8 at 23.   Ultimately, Cox resigned from RENU and was offered a transfer to the non-arrestee position similar to the job Detective Breitfelder requested, and similar to other accommodated employees. Id; Ex. 9.   Accordingly, the Sheriff's department maintained a policy of allowing officers to continue working despite ongoing pain treatment and the Sheriff's argument that Breitfelder's vicodin use disqualified him from any continued employment is incredible.

B.      SHERIFF LEIS REFUSED PLAINTIFF'S REQUESTS FOR REASONABLE
        ACCOMODATION.

Employers are required to provide reasonable accommodation to qualified

employees with a disability which includes modifications to job requirements or

environment that otherwise allows the employee to perform the essential functions of the

position or other changes that "enable…an employee with a disability to enjoy equal

benefits and privileges of employment as are enjoyed by its other similarly situated

employees without disabilities."  29 C.F.R. § 1630.2(o)(1).  As the Sixth Circuit recently

ruled,

> "The ADA plainly states that re-assignment may be required to reasonably
> accommodate a worker with a disability.  In the context of the
> Rehabilitation Act, the Supreme Court has held, 'although employers are
> not required to find another job for an employee who is not qualified for
> the job he or she was doing, they cannot deny an employee alternative
> employment opportunities reasonably available under the employers
> existing policies.'  The same logic applies under the ADA…"  Kiphart v.
> Saturn Corp., 251 F.3d 573, 586 (6th Cir 2001)(quoting, School Bd. Of
> Nassua Co. v. Arline, 480 U.S. 273, 289 n.19 (1987).

The Sheriff Department's collective bargaining unit requires a reassignment for

employees on light duty.  Ex.5  Moreover, there exists a clear pattern of Sheriff Leis'

conformance with this contractual duty with several other employees, including Sergeant

Cox.  The existing policy, though, establishes a bifurcated job assignment based on the

employees' need to perform arrest duties without a clear definition of the essential duties

of the job.  Ex. 14.  In other cases, the Sheriff uses the "patrol clerk" position for

reassignment, which by the terms of the essential functions maintain duties related to

arrest requirements, including the ability to drag an average adult out of a jail cell, the

ability to break up fights and gain physical control of persons in custody and the ability to

fire a service weapon.  Ex. 13.  The only essential duties excluded from the alternative or

"reassigned" Patrol clerk position are the requirements for meeting agility tests and endurance to run a 1.5 mile. Id.

Detective Breitfelder was informed by a telephone call that he was reassigned to the position of Patrol Clerk in mid-November. Plaintiff knew that some of the functions of Patrol Clerk were beyond the limitation of his disability. See Exhibit 4, Depo p. 97. Therefore, Detective Breitfelder requested a meeting with the Sheriff to discuss his limitations and his need for accommodations. Ex. 1 ¶27. In the meeting held November 19, 1999, less than 2 months after his injury, Plaintiff told the Sheriff that he could not do the job of Patrol Clerk without accommodations. Detective Breitfelder had held the position of Patrol Clerk in the past and knew he would be unable to handle prisoners or defend himself. Ex. 10 p. 96; Ex. 11p. 269. Instead, Plaintiff requested a job transfer to the computer division, the same job used of other employees who were temporarily disabled. Ex. 9, 8. The Sheriff refused the transfer, despite the fact that he alone can reassign and redesign job duties to accommodate officer's injuries. Ex. 14, Req ; Ex. 6.

As the meeting adjourned, Detective Breitfelder's father spoke to the Sheriff again requesting the reassignment to the non-arrest computer office. The Sheriff responded, "Well, gee, Joe couldn't you tough it out? You look okay." Ex. 15, p. 41. Yet, at that time, Detective Breifelder had toughed it out in purported light duty jobs in June and July and repeatedly was injured primarily due to a complete lack of accommodation. Then, in September he was re-injured while on light duty and following repeated requests for accommodation in the form of assistance with the installation of the covert tracking device. Those requests were refused, and it was patently reasonably for Detective Breitfelder to insist on a true light duty job, rather than rely on informal

accommodations or promises of accommodations.

The Sheriff does not dispute the fact that he denied the requested accommodation. Ex. 14, Req 7. Instead, the Sheriff insists that he denied the requested accommodation on the sole basis of his belief that Detective Breifelder's injury was a fraud. Ex. 6. As a result of this subjective opinion, the Sheriff further discriminated against Plaintiff by denying his occupational injury leave ("OIL") despite the fact that Detective Breitfelder's direct supervisors recommended approval and all physicians recognized that he could not perform his former job duties. Ex. 12. 16. A final meeting was held in April 2000 as a step in the OIL grievance process in which Detective Breitfelder pleaded for approval of his OIL benefits and offered to allow a full examination by any physician the Sheriff chose. He insisted that if that physician opined that he could return to work, he would comply. Not even this offer was sufficient to the Sheriff. Ex. 1, ¶30.

Thus, despite the contractual requirements for re-assignment, the pattern of similar re-assignments to data entry positions, the duty to accommodate under the ADA, the opinions of the preponderance of the physicians who examined the Plaintiff, Joe Breitfelder's refusal to, and inability to, "tough it out," as ordered by Sheriff Leis, ended all discussions – it was the Sheriff's way or the highway. And, as such, the Defendants violated Detective Breitfelder's right to a reasonable accommodation, as requested and frequently permitted by Sheriff Leis.

There is evidence that at the time of the April 2000 meeting, Detective Breitfelder was responding to treatment. Ex. 17. It appears that he will remain on pain medication indefinitely, but he was then improving and can maintain daily activities. Ex. 10. He continues to insist on his ability to perform the computer tasks in the data entry job at the

Sheriff's office, although he may continue to need some accommodation. Ex. 1, ¶32. In the meantime, in order to maintain support for his children and himself, and being unable to find alternative positions for which he is qualified, he has continued on the OPERS long term disability program.

C.    PLAINTIFF'S RECEIPT OF OPERS BENEFITS DOES NOT FORCLOSE A FINDING THAT DETECTIVE BREITFELDER IS OTHERWISE QUALIFIED OR CANNOT CLAIM  DISABILITY DISCRIMINATION.

Plaintiff's representations in his application for permanent disability are not evidence of Plaintiff not being otherwise qualified.  Plaintiff submitted his application for the OPERS disability program after the Sheriff refused to provide reasonable accommodations to him.  Plaintiff's application for disability can only be seen as evidence that Plaintiff could not perform essential duties of patrol clerk or detective without reasonable accommodation and without those accommodation Plaintiff was forced to apply for permanent disability.

Plaintiff learned of the Ohio Employee Retirement System Benefits (PERS) from the Sheriff's Department staff who informed him that OPERS would not preclude Plaintiff for returning to the Sheriff's Department.  "At the meeting on the 19th, Gail Wright brought something to me (Plaintiff) that I wasn't aware of.  She told me that a person that files for disability, that there's a five year term that, if, within five years, all the sudden I feel good enough to go back and do the job that I was assigned moments prior to my injury..." Ex. 2, p. 108.  Plaintiff applied for disability with the intent of returning to the Sheriff department when reasonable accommodations were extended to Plaintiff or when Plaintiff was able to return to the position without the need for reasonable accommodations.   "Since kindergarten, I (Plaintiff) knew I was going to be a cop.... That was what I wanted to do, that and only that; nothing else.  There's always

been a thing in the back of my head that I'm going to get back to some sort of law enforcement work." Id p. 109.

The OPERS program works as a long term disability program for situations in which a state employee who suffers an on-the-job injury which is determined to be permanent or presumed to be permanent.  O.R.C. §145.35 (E).  A disability is presumed to be permanent if "it is expected to last for a continuous period of not less than twelve (12) months. Id.   The disability benefit applies specifically to the service provided by the employee, and not to any and all jobs available.

Even though Plaintiff applied for and receives OPERS benefits, Plaintiff is not precluded from returning to the Sheriff Department and Plaintiff never construed his application for PERS benefits as a representation that he would be forever unable to perform law enforcement work of any kind.  Indeed, as explained to Plaintiff, the OPERS benefits could be terminated upon return to work as a result of  reasonable accommodations being extended to Plaintiff or upon Plaintiff gaining the ability perform the duties of Patrol Clerk without reasonable accommodations.  RC 145.362.

The OPERS program therefore works as either a long-term or permanent disability benefit.  It is not a necessary admission to, or conclusive of,  a permanent total disability.  Rather, the OPERS program specifically allows for return to duty when and if the employee is able.  Detective Breitfelder hopes to return to a law enforcement job with the appropriate job duties he can satisfy.  Thus, similar to the Kentucky Teachers Retirement benefit discussed in Justice v. Pike Co. Board of Education, Case No. 01-6156 (6th Cir Nov. 4 2003), Detective Breitfelder's OPERS benefit is distinguishable from a finding of total permanent disability and receipt of this benefit does not foreclose

him from being found "otherwise qualified" for a position with the Hamilton County

Sheriff's Department.  <u>See also</u>, <u>Cleveland v. Policy Mgt Sys.</u>  526 U.S. 795 (1999)

**IV.    GENUINE ISSUES OF MATERIAL FACT EXIST AS TO ANY
AMOUNT OF OVERPAYMENT DUE THE COUNTY FOR RECEIPT OF
OIL AND WORKERS COMPENSATION BENEFITS.**

Plaintiff herein acknowledges the duty to repay in accordance with the agreement

signed on October 20, 1999, eighteen (18) months BEFORE he received the OIL award.

Ex. 26.   Detective Breitfelder did as required by General Order 314.07.9, agreeing to the

assignment of benefits.  It was incumbent on the Sheriff's office to process this form,

and, it appears that the Sheriff's office never even signed the agreement or took the steps

necessary to collect the alleged overpaid funds.  <u>Id</u>.

Plaintiff submits that there exist genuine issues of material fact concerning the

amount of any overpayment and question the rationale for pursuit of these funds in this

setting as imbued with retaliation more than a desire for actual recovery.  Throughout

discovery in this case, no claim has been made for repayment, no questions asked about

an alleged double recovery, and no evidence presented of the actual amount of recovery.

By the plain words of the General Order, Detective Breitfelder fulfilled his duty, to sign

the authorization.  This late hour "claim" for double recovery is based on the Sheriff's

own negligence to process the authorization, than any bad act or negligence of the

Plaintiff here.

**IV.**    **CONCLUSION**

For all the above stated reasons, Plaitniff herein respectfully requests that the

Court deny Defendants motion for summary judgment.

Respectfully submitted,

LUCIAN J. BERNARD
ELIZABETH ZINK PEARSON
PEARSON & BERNARD PSC

/s/ Lucian J. Bernard
Lucian J. Bernard (0047159)
Trial Attorney
Pearson &Bernard PSC
1224 Highway Ave.
Covington, Ky.  41011
859-655-3700
859-655-3703(Fax)
ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I herein certify that a true and exact copy of the foregoing response to summary
judgment has been served upon Stephen Shaw, Hamilton County Prosecutors Office, this
__ day of December 2003 by first class mail, postage prepaid.

/s/ Lucian J. Bernard